**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**NATALIE DILLON**                                                    **PLAINTIFF**

**V.**                                          **CAUSE NO. 3:18-CV-481-CWR-FKB**

**WAL-MART 2720;**                                               **DEFENDANTS**
**WAL-MART STORES EAST, LP;**
**and JOHN DOES 1-3**

**ORDER**

Before the Court are Defendants Wal-Mart 2720 and Wal-Mart Stores East, LP's *Motion for Summary Judgment*; Defendants' *Motions in Limine*; and Plaintiff Natalie Dillon's *Motion to Exclude Defendant's Expert*. The matters are fully briefed and ready for adjudication.

I.   **Factual and Procedural History**

A.  **Dillon's Alleged Shoplifting**

This lawsuit involves Plaintiff Natalie Dillon shopping at the Wal-Mart store in Madison, Mississippi (Wal-Mart 2720), on August 12 and August 27, 2017. On both occasions, Dillon, accompanied by her three children, used the self-checkout registers before leaving the store. Wal-Mart's security cameras captured surveillance videos of each check-out.

On August 12, 2017, Dillon paid $116.05 for her items. Wal-Mart claims that she left the store with $160 worth of items, though—thus shoplifting the remaining $54.76 worth of items. Though the parties disagree with how many items Dillon correctly scanned and whether some of the scanning failures were Dillon's error or the machine's error, Dillon agrees that the video shows her "apparently failing to scan other items when she turned her attention to her children." Pl. Response at 11. For example, Dillon admitted in her deposition that she failed to scan items like a box of Fiber One snacks and a box of Smart Peanut Butter Snacks. Dillon acknowledged that she

scanned other items simultaneously, which caused at least one of them to fail to scan. She also agreed that she left Wal-Mart without paying for these items.

After exiting the store, a Wal-Mart employee stopped Dillon for having two unbagged frozen pizzas in her cart that did not appear on her receipt. The surveillance video revealed that Dillon had not taken the pizzas out of the cart to scan them. Dillon returned to the scanner and paid for the pizzas, but did not scan or pay for any of the other items that were later to be called into question.

Wal-Mart's then-"asset protection associate," Michael Griffin, did not observe the surveillance video on August 12 in real time. He says he was notified by a Wal-Mart employee that Dillon was stopped about the unscanned pizzas. Griffin later studied the surveillance video of Dillon's self-checkout on August 12 and believed that she had "skip-scanned" groceries. Wal-Mart says Griffin did not file shoplifting charges at this point because he did not know Dillon's identity and was waiting to see Dillon again to identify her.

That opportunity to identify Dillon came 15 days later, when Dillon returned to the store to shop with her three children. She paid $137.71, but as she headed out through the vestibule, Griffin, who had apparently watched the live video surveillance of Dillon using the self-checkout scanner,[1] stopped her and accused her of shoplifting $16.09 worth of items. The video showed Dillon failing to scan at least one "Smart One Meal." Dillon later admitted in her deposition that she failed to scan this item.

Griffin took Dillon and her children to a detention room. He stated that Dillon had not paid for her groceries, which Dillon denied and showed her receipt. Griffin informed Dillon that he had

---

[1] Dillon says that Griffin had also followed her around the store, taking photos of her on his personal phone. She claims this is against Wal-Mart policy. Wal-Mart policy, however, prohibits employees taking pictures of shoplifters under the age of 18.

been watching her and pointed to a receipt of hers on his "receipt board" from a prior trip she made to Wal-Mart.[2] Griffin also informed Dillon she could never come into another Wal-Mart or Sam's Club or she would be arrested. At some point, Griffin called the police.

Dillon asked to be let go and Griffin allegedly agreed to let her go—if she signed a document.[3] With crying children at her side and wanting to bring them home, Dillon signed the document. Dillon also testified in a deposition that Griffin would not let her call her husband, who is an attorney, but that 15 minutes into her detention he instructed her to call someone to pick up her kids. When she did, Wal-Mart employees would not let Dillon walk her children to her neighbor's car and instead kept her detained. After the children left the room, Dillon alleges that Griffin threatened to have the Mississippi Department of Human Services come take her children away. Dillon remained detained at Wal-Mart until the Madison Police came and arrested her for shoplifting.

Griffin signed criminal affidavits against Dillon for both instances of alleged shoplifting. Her trial was set for February 1, 2018. The case was dismissed after Griffin, who had been fired by Wal-Mart by that time,[4] did not appear. Evidence submitted in this litigation shows that he was terminated in December 2017 for stopping a customer for shoplifting and prematurely calling the police on that person, in violation of Wal-Mart policies.

Dillon states that she was "devastated" by her arrest. She was afraid to leave her house, and became withdrawn and isolated. She saw a psychiatrist who diagnosed her with PTSD and

---

[2] The parties have not stated, but presumably this receipt is from Dillon's August 12, 2017, checkout.

[3] The parties have not explained the nature of this document.

[4] Griffin was fired for stopping and accusing a customer of shoplifting, despite the fact the customer produced a receipt for the merchandise, in violation of Wal-Mart's shoplifting policies. Wal-Mart has a policy and procedure manual, called AP-09, which employees refer to as "the Bible." It identifies the steps asset protection associates must follow when dealing with a customer suspected of shoplifting. AP-09 identifies four elements that must be present before an asset protection associate can approach a customer and investigate the unlawful taking of merchandise: (1) selection and possession of merchandise; (2) concealment or dispossession of the merchandise; (3) continued possession of merchandise; and (4) passing the last point of sale without paying for the merchandise.

said she was having panic attacks. At her deposition, Dillon stated she continues to see a psychiatric nurse practitioner, who prescribes medication for depression. Dillon submitted evidence stating that, as a result of her arrest, "she was depressed, anxious, lost weight, began to self-isolate, and was having severe panic attacks."

### B.  Threat to sue letters

On September 6, 2017, Dillon received two letters, each titled "Settlement Offer," from Wal-Mart's attorney. Each letter threatened to sue her unless she paid $200 per accused shoplifting incident. These letters were generated by Palmer Recovery Attorneys, PLLC. Reginald Harrion, the attorney who signed the letters, said he did not review them before they were mailed to Dillon, as (he claimed) the language in the letter is boilerplate that is not person-specific.

Dillon argues that the letters were part of a broader Wal-Mart scheme to intimidate and defraud customers. She points to a deposition of Wayne Bowen, head of Wal-Mart's loss recovery department, who testified that his performance evaluation was based on how much money his department collected. Dillon then points to Wal-Mart emails showing that Mr. Bowen's Department directed outside counsel to increase revenue generated by these threat-to-sue letter by at least seven percent. The documents show a $15 million goal for civil recovery. Wal-Mart's internal emails acknowledge "there is a direct correlation between case counts and recoveries."[5] Dillon also points to the performance evaluation of the person who detained her (Griffin), which states, "Michael needs to work on his apprehension rate." Griffin's first asset protection manager testified that she compared existing years' apprehensions to prior years' apprehensions in order to gage an asset protection associate's performance.

---

[5] Dillon has submitted newspaper articles stating that this is a widespread practice. The Court cannot consider them, though, since newspaper articles are not admissible evidence.

## II.    Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). "Once a summary judgment motion is made and properly supported, the non-movant must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial. Neither 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the nonmovant's burden." *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996) (quotation marks and citations omitted).

A genuine dispute is one where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if its resolution could affect the ultimate disposition of the case. *Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.,* 482 F.3d 408, 411 (5th Cir. 2007).

The Court views the evidence and draws reasonable inferences in the light most favorable to the non-movant. *Duval v. N. Assur. Co. of Am.*, 722 F.3d 300, 303 (5th Cir. 2013). If after doing so, no evidence exists that allows reasonable inferences supporting the nonmoving party's position, then summary judgment must be granted. *St. Amant*, 806 F.2d at 1297.

## III.    Discussion

### A.  The Motion for Summary Judgment

Because this case is proceeding in diversity, the applicable substantive law is that of the forum state, Mississippi. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). Mississippi law is determined by looking to the decisions of the Mississippi Supreme Court. *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*, 953 F.2d 985, 988 (5th Cir. 1992).

### 1.  Malicious Prosecution

Under Mississippi law, a plaintiff must establish six elements for a malicious prosecution claim:

> (1) the institution of a proceeding; (2) by, or at the insistence of the defendant; (3) the termination of such proceeding in the plaintiff's favor; (4) malice in instituting the proceeding; (5) want of probable cause for the proceeding; and (6) the suffering of the injury or damage as a result of the prosecution.

*McClinton v. Delta Pride Catfish, Inc.*, 792 So. 2d 968, 973 (Miss. 2001).

Wal-Mart does not challenge the first three elements. Dillon was arrested for shoplifting at the insistence of Wal-Mart's then-employee, Griffin, and the criminal charges were later dismissed. Instead, Wal-Mart contends that the last three elements are not met, particularly that Dillon cannot prove a lack of probable cause.

"The tort of malicious prosecution must fail where a party has probable cause to institute an action." *Van v. Grand Casinos of Miss., Inc.*, 767 So. 2d 1014, 1019-20 (Miss. 2000). Probable cause requires that the defendant have both "(1) an honest belief in the guilt of the person accused, and (2) reasonable grounds for such belief." *Royal Oil Co. v. Wells*, 500 So. 2d 429, 443 (Miss. 1986). The Mississippi Supreme Court has stated that, for malicious prosecution, "[p]robable cause is determined from the facts apparent to the observer when the prosecution is initiated." *Benjamin v. Hooper Elec. Supply Co.*, 568 So. 2d 1182, 1190 (Miss. 1990). "For purposes of a malicious prosecution action, probable cause means reasonable cause." *Presley v. South Central Bell Telephone Company*, 684 F. Supp. 1397, 1299 (S.D. Miss. 1988). "So long as the instigator of the action 'reasonably believed he [had] a good chance of establishing [his case] to the satisfaction of the court or the jury[,]' he is said to have had probable cause." *Moon v. Condere Corp.*, 690 So. 2d 1191, 1195 (Miss. 1997).

Under Mississippi law, in malicious prosecution cases "the question of probable cause is a mixed question of law and fact; that whether the circumstances alleged to constitute probable cause are sufficiently established, is a matter of fact for the jury; but whether, supposing them to be true, as alleged, they amount to probable cause, is a question of law, to be decided by the court."

*Cross v. Forman, Perry, Watkins, Krutz, & Tardy, PLLC*, 182 F. App'x 308, 311 (5th Cir. 2006)

(quoting *Owens v. Kroger Co.*, 430 So. 2d 843, 847 (Miss. 1983)).

Here, the facts relevant to determining probable cause are not disputed. Wal-Mart employee Griffin reviewed surveillance video from August 12, where he saw Dillon fail to scan several items. While the parties dispute how many items failed to scan due to Dillon's actions, the video shows Dillon not scanning at least three items and, apparently distracted, scanning one item after her son had already scanned it. Dillon then removed these items from the store. In her deposition, Dillon agrees that she put unscanned items in her grocery bag, she left the store with these items, and that these actions on video would signal intent to shoplift. Fifteen days later, Griffin watched the surveillance video live as Dillon did not scan at least one "Smart Ones" box and scanned a box of Saltines with the barcode facing up. In her deposition, Dillon agreed that she did not scan the Smart Ones Meal that day. She then attempted to exit the Wal-Mart until blocked by Griffin in the vestibule.

Given these undisputed facts, Griffin and Wal-Mart had "reasonable cause" to seek to lodge shoplifting charges against Dillon. *Presley*, 684 F. Supp. at 1299. Dillon argues that on both August 12 and August 27, she did not have the intent to shoplift when she failed to scan items, and that Griffin did not have sufficient proof of her intent to shoplift for probable cause. It is difficult to credit this argument, given Dillon's agreement in her deposition that the August 12 video would signal intent to shoplift.

In addition, while Dillon's lack of intent may have impacted her criminal trial if the case had not been dismissed for Griffin's failure to appear, the Mississippi shoplifting statute expressly contains a presumption regarding intent. The pertinent section of the Mississippi shoplifting statute states: "The requisite intention to convert merchandise without paying the merchant's stated price for the merchandise is presumed, and shall be prima facie evidence thereof, when such person, . . . willfully: . . . (b) Removes or causes the removal of unpurchased merchandise from a store." Miss. Code Ann. § 97–23–93(2)(b). As the Court of Appeals of Mississippi stated, this statute "specifically provides . . . the intent to shoplift when merchandise is either concealed, removed, or caused to be removed." *Williams v. Jitney Jungle, Inc.*, 910 So. 2d 39, 42 (Miss. Ct. App. 2005).

It is true that the surveillance video on August 27 also shows Dillon scanning a Special K box after one of her children scanned the box, leading her to paying for that item twice. The videos also show other instances of Dillon looking for bar codes before scanning items. According to the statute, however, Dillon's sole action of leaving the store with items she did not pay for on August 12, coupled with the attempt to leave the store with unpaid items on August 27, was prima facie evidence of intent to shoplift such that Griffin had probable cause to stop, detain, and refer her to the police on both days. *See McNulty v. J.C. Penney Co.*, 305 F. App'x 212, 215 n.7 (5th Cir. 2008) ("McNulty's action of leaving the store with an item she did not pay for was prima facie evidence of intent to steal such that Greene had probable cause to stop, detain, and refer her to the authorities.")

Dillon then argues that Wal-Mart's reliance on the presumption of intent in Mississippi Code 97-23-93 is misplaced. She instead cites the so-called "shopkeeper's privilege" in Mississippi Code 97-23-95, which provides shopkeepers a qualified privilege to detain and question people accused of shoplifting if (1) there is a "good faith basis and probable cause based

upon reasonable grounds to detain and question the customer" and (2) "the detention and questioning of the customer was done in a reasonable manner." *Turner v. Hudson Salvage, Inc.*, 709 So. 2d 425 (Miss. 2008). Under Mississippi law, however, the shopkeeper's privilege is a shield, not a sword. *Id.* Dillon cannot rely upon it to prove her malicious prosecution theory.

Dillon also contends that Griffin lacked probable cause for the shoplifting charge because he violated Wal-Mart's policy manual, AP-09, which sets out the investigatory steps Wal-Mart requires its asset protection associates to follow. She contends that Griffin did not conduct a reasonable inquiry before contacting the police. Assuming for present purposes that Griffin failed to follow Wal-Mart's policies, however, that failure does not mean that there was no probable cause. *See Smith v. City of McComb*, No. 5:15-CV-55-DCB-MTP, 2017 WL 3687334, at *7 (S.D. Miss. Aug. 25, 2017) ("While internal corporate policies are relevant when considering the reasonableness of an employee's actions in a given context, the Court is unconvinced that the existence of an internal policy creates a legal duty to the general public where none previously existed."); *see also Keen v. Miller Envtl Grp., Inc.*, 702 F.3d 239, 248 (5th Cir. 2012) ("non-compliance with an internal policy is evidence that is probative of, but not dispositive of, breach of duty").

Dillon then cites *Benjamin v. Hooper*, 568 So. 2d 1182, (Miss. 1990) and *Junior Food Stores, Inc. v. Rice*, 671 So. 2d 67, 74 (Miss. 1996) to contend that Griffin should have investigated further on August 27 before calling the police. In those cases the Mississippi Supreme Court has stated that "where a reasonable person would investigate further prior to instituting a proceeding, the failure to do so is an absence of probable cause." *Junior Food Stores*, 671 So. 2d at 74 (citing *Benjamin*, 568 So. 2d at 1191). "To determine whether a reasonable person would have investigated further before instituting criminal proceedings against the plaintiff[], this Court need

only look at the facts available to the defendants at the time they caused the arrest of the plaintiff[]."

*Van v. Grand Casinos of Miss., Inc.*, 767 So. 2d 1014 (Miss. 2000).

Those cases are readily distinguishable. In *Junior Foods*, a store manager had an employee arrested and charged with grand larceny because the employee worked the last shift before the disappearance of money and the employee failed a polygraph test. The sole piece of evidence against the employee "was the polygraph test, which was admittedly subject to erroneous conclusions and inadmissible as evidence." 767 So. 2d at 1021 (citing *Junior Food Stores*, 671 So. 2d at 74-75). No witness could implicate the employee in the theft.

In *Benjamin*, a store manager overheard the plaintiff discussing a sound amplifier he purchased the day before from a different establishment for a seemingly low price. The store manager summoned a different salesperson to assist the plaintiff inside the store, then went outside and looked inside the plaintiff's car, and observed the serial number on the sound amplifier. The store manager then called the police, reporting the serial number, the car's license plate, and a description of the car. The plaintiff was later arrested and indicted, but the indictment was later dismissed. *Id.* at 1185-86. In Benjamin's lawsuit against the defendants for malicious prosecution, the trial court granted summary judgment in favor of defendants. On appeal, however, the Mississippi Supreme Court held that a jury should have been given the opportunity to examine the evidence because they could have found that there was no probable cause.

The differences between those situations and our own are obvious. In both *Junior Foods* and *Benjamin*, there was no witness who actually watched the plaintiff take the alleged items. Here, however, Griffin's conclusions were "based on something perhaps even more reliable than [] an eye witness—that is, a video surveillance camera." *Van,* 767 So. 2d at 1021.

Dillon's arguments get weaker from here and need not be addressed in further detail. The undisputed facts are simple: Griffin relied on two videos showing Dillon fail to scan items. On August 12, Dillon removed unscanned items from the store. And on August 27, Dillon would have removed unscanned items from the store if she had not been stopped by Griffin. These undisputed facts are sufficient to establish probable cause. Since there was probable cause, Dillon cannot establish all six elements needed for the malicious prosecution claim. Thus, the motion for summary judgment on the malicious prosecution claim is granted.

### 2. False arrest and False Imprisonment

To show false imprisonment in Mississippi, a plaintiff must prove that she was: "(1) detained and (2) such detainment was unlawful." *Mayweather v. Isle of Capri Casino*, 996 So. 2d 136, 140 (Miss. Ct. App. 2008). The elements for false imprisonment and false arrest are essentially identical. *Hobson v. Dolgencorp, LLC*, 142 F. Supp. 3d 487, 493 n.3 (S.D. Miss. 2015); *see Hart v. Walker*, 720 F.2d 1436, 1439 (5th Cir. 1983). "False arrest is an intentional tort, arising when one causes another to be arrest falsely, unlawfully, maliciously, and without probable cause." *City of Mound Bayou v. Johnson*, 562 So. 2d 1212, 1218 (Miss. 1990).

"As with a claim for malicious prosecution, a claim of false arrest must fail where there was probable cause to make the arrest." *Van v. Grand Casinos of Mississippi, Inc.*, 767 So. 2d 1014, 1019-20 (Miss. 2000). As described above, the surveillance video and the undisputed facts create sufficient probable cause under Mississippi's shoplifting statute. Thus, the motion for summary judgment on the false arrest and false imprisonment claims is granted.

### 3. Remaining Causes of Action

Defendants also seek summary judgment on Dillon's remaining causes of action: negligent hiring, training, and supervising; intentional infliction of emotional distress; and negligent

infliction of emotional distress. These claims must be addressed at a hearing and, perhaps, by additional motion practice.

On one hand, Wal-Mart appears to have a widespread practice of pursuing civil recovery from alleged shoplifters in excess of its actual losses. Dillon has provided letters from Wal-Mart's counsel demanding that she pay them $200 per incident of accused shoplifting to "settle" the civil claims Wal-Mart could possibly bring. Making reasonable inferences in her favor, as the legal standard requires, Dillon also has provided evidence indicating that Wal-Mart bases loss mitigation associates' performance reviews and department funding based on the associate's shoplifting apprehension rate. The evidence suggests but does not conclusively prove Dillon's argument that (1) Wal-Mart has a "nationwide practice of pressuring employees to increase arrests year over year"; and (2) Wal-Mart rewards its employees for making false arrests and gives funding to the asset protection department based on stops; despite (3) Wal-Mart being warned that its loss prevention policy encourages false arrests. If these practices caused Griffin's conduct in this case, they might have resulted in Dillon's emotional distress. The extent of her emotional distress is in dispute.

On the other hand, if this evidence might sustain a class action against Wal-Mart for consumer fraud, no class certification was ever sought in this case. Nor has Dillon advanced a Fair Debt Collection Practices Act claim to seek damages for Wal-Mart's collection letters or practices. It is not obvious that the collection activities caused her harm, as she did not pay the $200 per incident Wal-Mart demanded. And damages are in doubt: since Dillon twice walked out of Wal-Mart without paying for everything, Wal-Mart will likely argue at trial that those sums should offset any damages she receives for Griffin's threats and badgering.

The Court would like to hear argument on these remaining issues. Thus, the motion for summary judgment as to these remaining claims is denied without prejudice, as is Wal-Mart's motion for partial summary judgment on Dillon's claim for punitive damage.

### B.  Defendants' Motions *in Limine*

Many of the issues presented in Defendants' motions *in limine* are at first glance more suitable for resolution at trial,[6] when the evidence can be understood with particularity. Regrettably, in the time of this pandemic, it is not clear when such trial can be held. Scheduling a civil trial for 2020 is not likely. Given the circumstances, the Court believes that the best course of action is to deny the motions without prejudice to their refiling two weeks before the commencement of trial, if any, when they can be resolved with the evidence at hand and the ruling can be carried consistently through the proceeding.[7]

### C.  Dillon's Motion to Exclude Defendants' Expert

Lastly, Dillon has moved to exclude the anticipated testimony of Defendants' expert Gerald O'Brien. Defendants designated Dr. O'Brien to provide expert opinions on (1) Dillon's intent to shoplift and (2) that Dillon's therapy "was not principally related to the incidents at Walmart and that the limited treatment she underwent was insufficient to make or support any related diagnosis."

Dillon's motion to exclude focuses only on Dr. O'Brien's first opinion. Wal-Mart has now advised Dillon and the Court that it no longer intends to offer that opinion through Dr. O'Brien. Thus, this motion is now moot.[8]

---

[6] If any trial is necessary.

[7] Defendants also moved to strike Dillon's Exhibit 28. The Court did not rely on this exhibit and thus the motion to strike is moot.

[8] Parties have also moved to seal or restrict various exhibits. The magistrate judge will take up those motions.

**IV.     Conclusion**

For the above reasons, Defendants' motion for summary judgment is granted in part and denied in part. Defendants' motions *in limine* are denied without prejudice. Dillon's motion to exclude Dr. O'Brien is dismissed as moot.

**SO ORDERED**, this the 14th day of September, 2020.

s/ Carlton W. Reeves

UNITED STATES DISTRICT JUDGE